## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| NAKIA KING, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>LEXISNEXIS RISK SOLUTIONS INC.,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Nakia King ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action against Defendant LexisNexis Risk Solutions Inc. ("Defendant" or "LNRS"), and alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the proposed class who are diverse from Defendant, and (4) there are more than 100 proposed Class members.

2.      This Court has general personal jurisdiction over Defendant because Defendant is a resident and citizen of this District, Defendant conducts substantial

business in this District, and the events giving rise to Plaintiff's claims arise out of Defendant's contacts with this District.

3.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is a resident and citizen of this District.

## PARTIES

4.    Plaintiff Nakia King is a resident and citizen of Ohio.

5.    Defendant LexisNexis Risk Solutions Inc. is a corporation with its principal place of business located at 1000 Alderman Drive, Alpharetta, Georgia.

## FACTUAL ALLEGATIONS

**LNRS's Business**

6.    Defendant LNRS avers that it "provides customers with innovative technologies, information-based analytics, decisioning tools and data management services that help them solve problems, make better decisions, stay compliant, reduce risk and improve operations. Headquartered in metro-Atlanta, Georgia it operates within the Risk market segment of RELX, a global provider of information-based analytics and decision tools for professional and business customers."[1]

7.    Defendant represents that "[i]n a world of growing data, the protection of privacy and responsible data use are paramount. Our products and services are designed to reduce fraud, mitigate risk, make society safer and — most importantly

---

[1]*See* https://risk.lexisnexis.com/about-us#tab-8ca97cee-35f8-4d9a-b496-fa2370fe571a (last accessed June 4, 2025).

— safeguard private data. At LexisNexis Risk Solutions, our commitment to responsible data stewardship is just one way we can make the world a safer place."[2]

8.    Plaintiff and Class members provided certain Personally Identifying Information ("PII") to Defendant directly, or to entities that do business with Defendant.

9.    As a data management service provider with an acute interest in maintaining the confidentiality of the PII entrusted to it, Defendant is well-aware of the numerous data breaches that have occurred throughout the United States and its responsibility for safeguarding PII in its possession.

**The Data Breach**

10.    According to Defendant, on April 1, 2025, Defendant "learned that on December 25, 2024, an unauthorized third party acquired certain LNRS data from a third-party platform used for software development." ("the Data Breach").[3]

11.    Defendant claims that it "promptly launched an investigation with the assistance of leading external cybersecurity experts, notified law enforcement and took steps to review and further enhance our security controls. We also initiated an extensive review of the impacted data to identify personal information that may have

---

[2]    *See*    https://risk.lexisnexis.com/about-us#tab-f28f6e57-501d-4938-839c-851403f615b6 (last accessed June 4, 2025).
[3] *See* https://www.maine.gov/cgi-bin/agviewerad/ret?loc=2634 (last accessed June 4, 2025).

been affected."[4]

12.    Ultimately, Defendant determined that the types of information compromised included names, contact information (such as phone numbers, postal, or email addresses), Social Security numbers, driver's license numbers, and dates of birth.

13.    According to a notice of data breach filed with the Attorney General of Maine, the Data Breach has affected 364,333 individuals.[5]

14.    Defendant began notifying affected individuals by sending them personally-addressed Notice Letters on or about May 24, 2025.[6]

15.    Plaintiff received such a Notice Letter.  The Notice Letter addressed to Plaintiff informed her that her PII that may have been compromised included her "name, contact information (such as phone number, postal or email addresses), Social Security number, driver's license number, or date of birth."[7]

16.    Defendant did not inform Plaintiff or other affected individuals of the root cause of the Data Breach.[8]

---

[4] *Id.*

[5] *See* Data Breach Notifications, Office of the Maine Attorney General, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/782e2159-f2d4-4394-8d03-51bf08a6b3e5.html (last accessed June 4, 2025).

[6] *See* Notice of Data Breach addressed to Plaintiff, attached hereto as Exhibit 1 ("Notice Letter").

[7] *Id*.

[8] *Id*.

17.    Defendant did not state why more than three months elapsed between the time the data was acquired by an unauthorized actor and Defendant's discovery thereof.

18.    Defendant failed to prevent the data breach because it did not adhere to commonly accepted security standards and failed to detect that its databases were subject to a security breach.

**Injuries to Plaintiff and the Class**

19.    As a result of the Data Breach, Plaintiff has suffered severe emotional distress and anxiety knowing that her name and Social Security number have been impacted.

20.    Plaintiff is very concerned about the theft of her PII and anticipates spending substantial amounts of time and energy aimed at thwarting adverse effects as a result of the Data Breach.

21.    As a direct and proximate result of Defendant's actions and omissions in failing to protect Plaintiff's PII, Plaintiff and the Class have been damaged.

22.    Plaintiff and the Class have been placed at a substantial risk of harm in the form of credit fraud or identity theft and have incurred and will likely incur additional damages, including spending substantial amounts of time monitoring accounts and records, in order to prevent and mitigate credit fraud, identity theft, and financial fraud.

23.    In addition to the irreparable damage that may result from the theft of PII, identity theft victims must spend numerous hours and their own money repairing the impacts caused by a data breach. After conducting a study, the Department of Justice's Bureau of Justice Statistics found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.[9]

24.    Plaintiff and the Class will spend substantial time and expense (a) monitoring their accounts to identify fraudulent or suspicious charges; (b) cancelling and reissuing cards; (c) purchasing credit monitoring and identity theft prevention services; (d) attempting to withdraw funds linked to compromised, frozen accounts; (e) removing withdrawal and purchase limits on compromised accounts; (f) communicating with financial institutions to dispute fraudulent charges; (g) resetting automatic billing instructions and changing passwords; (h) freezing and unfreezing credit bureau account information; (i) cancelling and re-setting automatic payments as necessary; (j) paying late fees and declined payment penalties as a result of failed automatic payments; and (k) managing the severe anxiety that has been caused by their being personally threatened.

---

[9] U.S. Dep't of Justice, *Victims of Identity Theft, 2014* (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf.

25.    Plaintiff and the Class have suffered severe emotional distress as a result of their PII being compromised and will continue to suffer for an indefinite period of time. Since Plaintiff and the Class may not change their Social Security numbers, their heightened risk of becoming victims of fraud is now permanent. Plaintiff and the Class will remain aware of both this permanent risk as well as their permanent inability to cure that risk until it manifests itself in the form of fraud.

26.    Additionally, Plaintiff and the Class have suffered or are at increased risk of suffering from, *inter alia*, the loss of the opportunity to control how their PII is used, the diminution in the value and/or use of their PII entrusted to Defendant, and loss of privacy.

**The Value of PII**

27.    It is well known that PII is an invaluable commodity and a frequent target of hackers.

28.    According to Javelin Strategy & Research, in 2017 alone over 16.7 million individuals were affected by identity theft, causing $16.8 billion to be stolen.[10]

29.    People place a high value not only on their PII, but also on the privacy of that data. This is because identity theft causes "significant negative financial

---

[10] Javelin Strategy & Research, *Identity Fraud Hits All Time High With 16.7 Million U.S. Victims in 2017, According to New Javelin Strategy & Research Study* (Feb. 6, 2018), https://www.javelinstrategy.com/press-release/identity-fraud-hits-all-time-high-167-million-us-victims-2017-according-new-javelin.

impact on victims" as well as severe distress and other strong emotions and physical reactions.[11]

30.    People are particularly concerned with protecting the privacy of their social security numbers, which are the "secret sauce" that is "as good as your DNA to hackers."[12] There are long-term consequences to data breach victims whose social security numbers are taken and used by hackers. Even if they know their social security numbers have been accessed, Plaintiff and Class members cannot obtain new numbers unless they become a victim of social security number misuse. Even then, the Social Security Administration has warned that "a new number probably won't solve all [] problems … and won't guarantee … a fresh start."[13] The Social Security Administration's reactive security measures make Plaintiff and Class Members especially prone to severe anxiety and emotional distress. Victims of a data breach must remain conscious of their vulnerability of identity theft, awaiting nefarious use of their social security information, while knowing they may not receive protection from that misuse until after it has occurred.

31.    Defendant acknowledged the immense value of that PII had to Plaintiff

---

[11] Identity Theft Resource Center, *Identity Theft: The Aftermath 2017*, https://www.ftc.gov/system/files/documents/public_comments/2017/10/00004-141444.pdf.

[12] Cameron Huddleston, *How to Protect Your Kids From the Anthem Data Breach*, Kiplinger, (Feb. 10, 2015), https://www.kiplinger.com/article/credit/T048-C011-S001-how-to-protect-your-kids-from-the-anthem-data-brea.html.

[13] Social Security Admin., *Identity Theft and Your Social Security Number*, at 6-7, https://www.ssa.gov/pubs/EN-05-10064.pdf.

and the Class insofar as they sent them a document outlining "What You Can Do" and provided them with two years of credit monitoring services. However, the provision of credit monitoring services is abbreviated, and the document that guides Plaintiff and the Class in protecting their PII serves to emphasize that Defendant has placed the onus on those affected to retain the value of their PII.

### Industry Standards for Data Security

32.    In light of the numerous high-profile data breaches targeting companies like Target, Neiman Marcus, eBay, Anthem, Deloitte, Equifax, and Capital One, Defendant is, or reasonably should have been, aware of the importance of safeguarding PII, as well as of the foreseeable consequences of its systems being breached.

33.    Security standards commonly accepted among businesses that store PII using the internet include, without limitation:

      a.  Maintaining a secure firewall configuration;

      b.  Monitoring for suspicious or irregular traffic to servers;

      c.  Monitoring for suspicious credentials used to access servers;

      d.  Monitoring for suspicious or irregular activity by known users;

      e.  Monitoring for suspicious or unknown users;

      f.  Monitoring for suspicious or irregular server requests;

      g.  Monitoring for server requests for PII;

      h.  Monitoring for server requests from VPNs; and

i.   Monitoring for server requests from Tor exit nodes.

34.    The U.S. Federal Trade Commission ("FTC") publishes guides for businesses for cybersecurity[14] and protection of PII[15] which includes basic security standards applicable to all types of businesses.

35.    The FTC recommends that businesses:

a.  Identify all connections to the computers where you store sensitive information.

b.  Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

c.  Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business.

d.  Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

e.  Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks

---

[14] Start with Security: A Guide for Business, FTC (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.
[15] Protecting Personal Information: A Guide for Business, FTC (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting personalinformation.pdf.

f.  Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet.

g.  Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

h.  Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

i.  Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

36.  The FTC has also issued guidance on reactive measures entities should take after they have suffered a data breach. Notably, the FTC advises that such entities should not "make misleading statements about the breach" or "withhold key details that might help consumers protect themselves and their information."[16]

37.  Defendant failed to adhere to the FTC's guidance in their communications with affected individuals after the Data Breach occurred, as it

---

[16] Federal Trade Commission, *Data Breach Response: A Guide for Business*, https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business.

withheld the "key detail" that affected individuals' PII was held for ransom by a known ransomware group.

38.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[17]

39.    Because Defendant was entrusted with consumers' PII, it had, and has, a duty to consumers to keep their PII secure.

40.    Consumers, such as Plaintiff and the Class, reasonably expect that when they provide PII to companies or when those companies forward their PII to companies such as Defendant, that their PII will be safeguarded.

41.    Nonetheless, Defendant failed to prevent the Data Breach. Had Defendant properly maintained and adequately protected its systems, it could have prevented the Data Breach.

---

[17] Federal Trade Commission, *Privacy and Security Enforcement: Press Releases*, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement.

## CLASS ACTION ALLEGATIONS

42.     Plaintiff, individually and on behalf of all others, brings this class action pursuant to Fed. R. Civ. P. 23.

43.     The proposed Class is defined as follows:

> All persons whose PII was maintained by Defendant and was compromised in the Data Breach.

44.     Plaintiff reserves the right to modify, change, or expand the definition of the proposed Class based upon discovery and further investigation.

45.     *Numerosity*: The proposed Class is so numerous that joinder of all members is impracticable. Although the precise number is not yet known to Plaintiff, Defendant has reported that the number of persons affected by the Data Breach is approximately 364,333 individuals.[18] The Class members can be readily identified through Defendant's records.

46.     *Commonality*: Questions of law or fact common to the Class include, without limitation:

> a.   Whether Defendant owed a duty or duties to Plaintiff and the Class to exercise due care in collecting, storing, safeguarding, and obtaining their PII;
>
> b.   Whether Defendant breached that duty or those duties;
>
> c.   Whether Defendant failed to establish appropriate administrative, technical, and physical safeguards to ensure the security and

---

[18] *See supra* fn 5.

confidentiality of records to protect against known and anticipated threats to security;

d.  Whether the security provided by Defendant was satisfactory to protect customer information as compared to industry standards;

e.  Whether Defendant misrepresented or failed to provide adequate information to customers regarding the type of security practices used;

f.  Whether Defendant knew or should have known that it did not employ reasonable measures to keep Plaintiff's and the Class's PII secure and prevent loss or misuse of that PII;

g.  Whether Defendant acted negligently in connection with the monitoring and protecting of Plaintiff's and Class's PII;

h.  Whether Defendant's conduct was intentional, willful, or negligent;

i.  Whether Defendant violated any and all statutes and/or common law listed herein;

j.  Whether the Class suffered damages as a result of Defendant's conduct, omissions, or misrepresentations; and

k.  Whether the Class is entitled to injunctive, declarative, and monetary relief as a result of Defendant's conduct.

47.  *Typicality*: The claims or defenses of Plaintiff are typical of the claims or defenses of the Class. Class members were injured and suffered damages in substantially the same manner as Plaintiff, Class members have the same claims against Defendant relating to the same course of conduct, and Class members are entitled to relief under the same legal theories asserted by Plaintiff.

48.  *Adequacy*: Plaintiff will fairly and adequately protect the interests of the proposed Class and has no interests antagonistic to those of the proposed Class.

Plaintiff has retained counsel experienced in the prosecution of complex class actions including, but not limited to, data breaches.

49.     *Predominance*: Questions of law or fact common to proposed Class members predominate over any questions affecting only individual members. Common questions such as whether Defendant owed a duty to Plaintiff and the Class and whether Defendant breached its duties predominate over individual questions such as measurement of economic damages.

50.     *Superiority*: A class action is superior to other available methods for the fair and efficient adjudication of these claims because individual joinder of the claims of the Class is impracticable. Many members of the Class are without the financial resources necessary to pursue this matter. Even if some members of the Class could afford to litigate their claims separately, such a result would be unduly burdensome to the courts in which the individualized cases would proceed. Individual litigation increases the time and expense of resolving a common dispute concerning Defendant's actions toward an entire group of individuals. Class action procedures allow for far fewer management difficulties in matters of this type and provide the unique benefits of unitary adjudication, economies of scale, and comprehensive supervision over the entire controversy by a single judge in a single court.

51.     *Manageability*: Plaintiff is unaware of any difficulties that are likely to

be encountered in the management of this action that would preclude its maintenance as a class action.

52.    The Class may be certified pursuant to Rule 23(b)(2) because Defendant has acted on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

53.    The Class may also be certified pursuant to Rule 23(b)(3) because questions of law and fact common to the Class will predominate over questions affecting individual members, and a class action is superior to other methods for fairly and efficiently adjudicating the controversy and causes of action described in this Complaint.

54.    Particular issues under Rule 23(c)(4) are appropriate for certification because such claims present particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE/ NEGLIGENCE PER SE

55.    Plaintiff hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

56.    Defendant owed a duty of care to Plaintiff and Class members to use reasonable means to secure and safeguard the PII that had been entrusted to

Defendant, to prevent its unauthorized access and disclosure to third parties, to guard it from theft, and to detect any attempted or actual breach of Defendant's systems. These common law duties existed because Plaintiff and Class members were the foreseeable and probable victims of any inadequate security practices. In fact, not only was it foreseeable that Plaintiff and Class members would be harmed by Defendant's failure to protect their PII because hackers routinely attempt to steal such information and use it for nefarious purposes, but Defendant knew that it was more likely than not Plaintiff and Class members would be harmed by such exposure of their PII.

57.    Defendant's duties to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect PII. Various FTC publications and data security breach orders further form the basis of Defendant's duties. In addition, individual states have enacted statutes based upon the FTC Act that also created a duty.

58.    Defendant's violations of Section 5 of the FTC Act constitute negligence per se.

59.    Defendant breached the aforementioned duties when it failed to use security practices that would protect the PII provided to it by Plaintiff and Class

members, thus resulting in unauthorized third-party access to the Plaintiff's and Class members' PII.

60.    Defendant further breached the aforementioned duties by failing to design, adopt, implement, control, manage, monitor, update, and audit its processes, controls, policies, procedures, and protocols to comply with the applicable laws reasonable standards of care necessary to safeguard and protect Plaintiff's and Class members' PII within its possession, custody, and control.

61.    As a direct and proximate cause of failing to use appropriate security practices, Plaintiff's and Class members' PII was disseminated and made available to unauthorized third parties.

62.    Defendant admitted that Plaintiff's and Class members' PII was wrongfully disclosed as a result of the Data Breach.

63.    The Data Breach caused direct and substantial damages to Plaintiff and Class members, as well as the possibility of future and imminent harm through the dissemination of their PII and the greatly enhanced risk of credit fraud or identity theft.

64.    By engaging in the forgoing acts and omissions, Defendant committed the common law tort of negligence. For all the reasons stated above, Defendant's conduct was negligent and departed from reasonable standards of care including by, but not limited to: failing to adequately protect the PII; failing to conduct regular

security audits; and failing to provide adequate and appropriate supervision of persons having access to Plaintiff's and Class members' PII.

65.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and the Class, their PII would not have been compromised.

66.    Neither Plaintiff nor the Class contributed to the breach or subsequent misuse of their PII as described in this Complaint. As a direct and proximate result of Defendant's actions and inactions, Plaintiff and the Class have been put at an increased risk of credit fraud or identity theft, and Defendant has an obligation to mitigate damages by providing adequate credit and identity monitoring services. Defendant is liable to Plaintiff and the Class for the reasonable costs of future credit and identity monitoring services for a reasonable period of time, substantially in excess of two years. Defendant is also liable to Plaintiff and the Class to the extent that they have directly sustained damages as a result of identity theft or other unauthorized use of their PII, including the amount of time Plaintiff and the Class have spent and will continue to spend as a result of Defendant's negligence. Defendant is also liable to Plaintiff and the Class to the extent their PII has been diminished in value because Plaintiff and the Class no longer control their PII and to whom it is disseminated. Defendant is further liable to Plaintiff and the Class to the extent that they have suffered anxiety and emotional distress as a result of their heightened risk of becoming victims of credit fraud and identity theft.

## COUNT II
## INVASION OF PRIVACY

67.    Plaintiff hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

68.    Plaintiff and Class members have objective reasonable expectations of solitude and seclusion in their PII.

69.    Defendant invaded Plaintiff's and the Class's right to privacy by allowing unauthorized access to their PII and by negligently maintaining the confidentiality of Plaintiff's and the Class's PII, as set forth above.

70.    The intrusion was offensive and objectionable to Plaintiff, the Class, and to a reasonable person of ordinary sensibilities in that Plaintiff's and the Class's PII was disclosed without prior written authorization from Plaintiff and the Class.

71.    The intrusion was into a place or thing which was private and is entitled to be private, in that Plaintiff and the Class provided and disclosed their PII to Defendant privately with an intention that the PII would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable to believe that such information would be kept private and would not be disclosed without their written authorization.

72.    As a direct and proximate result of Defendant's above acts, Plaintiff's and the Class's PII was viewed, distributed, and used by persons without prior

written authorization and Plaintiff and the Class suffered damages as described herein.

73.    Defendant is guilty of oppression, fraud, or malice by permitting the unauthorized disclosure of Plaintiff's and the Class's PII with a willful and conscious disregard of their right to privacy.

74.    Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause Plaintiff and the Class severe and irreparable injury in that the PII maintained by Defendant can be viewed, printed, distributed, and used by unauthorized persons. Plaintiff and the Class have no adequate remedy at law for the injuries in that a judgment for the monetary damages will not end the invasion of privacy for Plaintiff and the Class, and Defendant may freely treat Plaintiff's and the Class's PII with sub-standard and insufficient protections.

## COUNT III
## UNJUST ENRICHMENT

75.    Plaintiff hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

76.    Plaintiff and the Class have an interest, both equitable and legal, in their PII that was conferred upon, collected by, and maintained by Defendant and that was ultimately compromised in the Data Breach.

77.    Defendant, by way of its acts and omissions, knowingly and deliberately enriched itself by saving the costs it reasonably should have expended on cybersecurity measures to secure Plaintiff's and the Class's PII.

78.    Defendant also understood and appreciated that the PII pertaining to Plaintiff and the Class was private and confidential and its value depended upon Defendant maintaining the privacy and confidentiality of that PII.

79.    Instead of providing for a reasonable level of security that would have prevented the breach—as is common practice among companies entrusted with such PII—Defendant instead made a conscious and opportunistic calculation to increase its own profits at the expense of Plaintiff's and the Class's security. Nevertheless, Defendant continued to obtain the benefits conferred on it by Plaintiff and the Class. The benefits conferred upon, received, and enjoyed by Defendant were not conferred officiously or gratuitously, and it would be inequitable and unjust for Defendant to retain these benefits.

80.    Plaintiff and the Class suffered as a direct and proximate result. As a result of Defendant's decision to profit rather than provide requisite security, and the resulting Data Breach disclosing Plaintiff's and the Class's PII, Plaintiff and the Class suffered and continue to suffer considerable injuries in the forms of, *inter alia,* attempted identity theft, time and expenses mitigating harms, diminished value of

PII, loss of privacy, increased risk of harm, and severe anxiety and emotional distress.

81.     Thus, Defendant engaged in opportunistic conduct in spite of its duties to Plaintiff and the Class, wherein it profited from interference with Plaintiff's and the Class's legally protected interests. As such, it would be inequitable, unconscionable, and unlawful to permit Defendant to retain the benefits it derived as a consequence of its conduct.

82.     Accordingly, Plaintiff, on behalf of herself and the Class, respectfully requests that this Court award relief in the form of restitution or disgorgement in the amount of the benefit conferred on Defendant as a result of its wrongful conduct, including specifically, the amounts that Defendant should have spent to provide reasonable and adequate data security to protect Plaintiff's and the Class's PII, and/or compensatory damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for a judgment against Defendant as follows:

    a.  For an order certifying the proposed Class, appointing Plaintiff as Representative of the proposed Class, and appointing the law firms representing Plaintiff as counsel for the Class;

    b.  For compensatory and punitive and treble damages in an amount to be determined at trial;

    c.  Payment of costs and expenses of suit herein incurred;

d.  Both pre-and post-judgment interest on any amounts awarded;

e.  Payment of reasonable attorneys' fees and expert fees;

f.  Such other and further relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury.

Dated: June 5, 2025                        Respectfully submitted,

*/s/ J. Cameron Tribble*
J. Cameron Tribble
**BARNES LAW GROUP, LLC**
31 Atlanta Street
Marietta, GA 30060
Tel: (678) 290-2246 (direct)
ctribble@barneslawgroup.com

Charles E. Schaffer*
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500
cschaffer@lfsblaw.com

Jeffrey S. Goldenberg*
**GOLDENBERG SCHNEIDER, LPA**
4445 Lake Forest Drive, Suite 490
Cincinnati, OH 45242
Tel: (513) 345-8291
jgoldenberg@gs-legal.com

Brett R. Cohen*
**LEEDS BROWN LAW, P.C.**
One Old Country Road, Suite 347

Carle Place, NY 11514
Tel: (516) 873-9550
bcohen@leedsbrownlaw.com

*Pro hac vice application to be filed

*Counsel for Plaintiff and Proposed
Class*

# EXHIBIT 1



Return Mail Processing
PO Box 999
Suwanee, GA 30024

497 1 102229 ••••••••••••••••••AUTO**ALL FOR AADC 442
NAKIA R KING



May 24, 2025

## NOTICE OF DATA BREACH

*Dear Nakia R King,*

LexisNexis Risk Solutions ("LNRS") provides risk management services to business customers. We are writing to notify you of an issue that involves certain of your personal information.

### What Happened?

On April 1, 2025, we learned that on December 25, 2024, an unauthorized third party acquired certain LNRS data from a third-party platform used for software development. The issue did not affect LNRS's own networks or systems. Based on our review of the impacted data, we have determined that certain of your personal information was affected.

### What Information Was Involved?

The types of impacted personal information varied by affected individual, and could have included name, contact information (such as phone number, postal or email address), Social Security number, driver's license number or date of birth. No financial or credit card information was affected. We have no evidence that your data has been further misused.

### What We Are Doing

*Upon learning of the issue,* we promptly launched an investigation with the assistance of leading external cybersecurity experts, notified law enforcement and took steps to review and further enhance our security controls. We also initiated an extensive review of the impacted data to identify personal information that may have been affected.

### What You Can Do

We recommend that you remain vigilant for incidents of fraud and identity theft by reviewing your account statements and monitoring your free credit reports. If you would like to check your credit report, you are entitled under US law to one free credit report annually from each of the three nationwide consumer reporting agencies. US residents can order a free credit report by visiting www.annualcreditreport.com or calling toll-free at 1-877-322-8228. The Reference Guide below provides recommendations by the US Federal Trade Commission on the protection of personal information. We also recommend that you remain alert for unsolicited communications involving your personal information.

In addition, we have arranged to offer you identity protection and credit monitoring services for two years at no cost to you. The Reference Guide below provides information on how to activate these services.

**For More Information**
We take our obligation to safeguard personal information very seriously and regret any inconvenience this may cause you. If you have any questions regarding this issue, please call 1-833-918-9002 Monday through Friday from 9 a.m. to 9 p.m. Eastern.

Sincerely,

Elise Quadrozzi
Vice President
Consumer Operations and Compliance

Reference Guide

We encourage you to take the following steps:

**Enroll in Complimentary Identity Protection and Credit Monitoring Services.**

To help protect your identity, we are offering complimentary access to Experian IdentityWorks℠ for 24 months.

If you believe there was fraudulent use of your information as a result of this incident and would like to discuss how you may be able to resolve those issues, please reach out to an Experian agent. If, after discussing your situation with an agent, it is determined that identity restoration support is needed then an Experian Identity Restoration agent is available to work with you to investigate and resolve each incident of fraud that occurred from the date of the incident (including, as appropriate, helping you with contacting credit grantors to dispute charges and close accounts; assisting you in placing a freeze on your credit file with the three major credit bureaus; and assisting you with contacting government agencies to help restore your identity to its proper condition).

Please note that Identity Restoration is available to you for 24 months from the date of this letter and does not require any action on your part at this time. The Terms and Conditions for this offer are located at www.ExperianIDWorks.com/restoration.

While identity restoration assistance is immediately available to you, we also encourage you to activate the fraud detection tools available through Experian IdentityWorks as a complimentary 24-month membership. This product provides you with superior identity detection and resolution of identity theft. To start monitoring your personal information, please follow the steps below:

- Ensure that you **enroll by August 31, 2025** (Your code will not work after this date.)
- **Visit** the Experian IdentityWorks website to enroll: https://www.experianidworks.com/credit
- Provide your **activation code**: ███████

If you have questions about the product, need assistance with Identity Restoration that arose as a result of this incident, or would like an alternative to enrolling in Experian IdentityWorks online, please contact Experian's customer care team at 1-833-918-9002 by August 31, 2025. Be prepared to provide engagement number ███████ as proof of eligibility for the Identity Restoration services by Experian.

## ADDITIONAL DETAILS REGARDING YOUR 24-MONTH EXPERIAN IDENTITYWORKS MEMBERSHIP

A credit card is not required for enrollment in Experian IdentityWorks. You can contact Experian immediately regarding any fraud issues, and have access to the following features once you enroll in Experian IdentityWorks:

- **Experian credit report at signup:** See what information is associated with your credit file. Daily credit reports are available for online members only.*
- **Credit Monitoring:** Actively monitors Experian file for indicators of fraud.
- **Identity Restoration:** Identity Restoration specialists are immediately available to help you address credit and non-credit related fraud.

* Offline members will be eligible to call for additional reports quarterly after enrolling.

- **Experian IdentityWorks ExtendCARE™:** You receive the same high-level of Identity Restoration support even after your Experian IdentityWorks membership has expired.
- **$1 Million Identity Theft Insurance**:** Provides coverage for certain costs and unauthorized electronic fund transfers.

**Order Your Free Credit Report.** To order your free credit report, visit www.annualcreditreport.com, call toll-free at 1-877-322-8228 or complete the Annual Credit Report Request Form on the U.S. Federal Trade Commission's ("FTC's") website at www.consumer.ftc.gov and mail it to Annual Credit Report Request Service, P.O. Box 105281, Atlanta, GA 30348-5281. The three nationwide consumer reporting agencies provide free annual credit reports only through the website, toll-free number or request form.

When you receive your credit report, please review it carefully. Look for accounts you did not open. Look in the "inquiries" section for names of creditors from whom you haven't requested credit. Some companies bill under names other than their store or commercial names. The consumer reporting agency will be able to tell you when that is the case. Look in the "personal information" section for any inaccuracies in your information (such as home address and Social Security number). If you see anything you do not understand, call the consumer reporting agency at the telephone number on the report. Errors in this information may be a warning sign of possible identity theft. You should notify the consumer reporting agencies of any inaccuracies in your report, whether due to error or fraud, as soon as possible so the information can be investigated and, if found to be in error, corrected. If there are accounts or charges you did not authorize, immediately notify the appropriate consumer reporting agency by telephone and in writing. Consumer reporting agency staff will review your report with you. If the information cannot be explained, then you will need to call the creditors involved. Information that cannot be explained also should be reported to your local police or sheriff's office because it may signal criminal activity.

**Report Incidents.** If you detect any unauthorized transactions in a financial account, promptly notify your payment card company or financial institution. If you are in the US and detect any incident of identity theft or fraud, promptly report the incident to law enforcement, the FTC and your state Attorney General. If you believe your identity has been stolen, the FTC recommends that you take these steps:

- Close the accounts that you have confirmed or believe have been tampered with or opened fraudulently. For more information, please visit https://www.identitytheft.gov/.
- File a local police report. Obtain a copy of the police report and submit it to your creditors and any others that may require proof of the identity theft crime.

You can contact the FTC to learn more about how to protect yourself from becoming a victim of identity theft and how to repair identity theft:

Federal Trade Commission
Consumer Response Center
600 Pennsylvania Avenue, NW
Washington, DC 20580 1-877-IDTHEFT (438-4338)
www.ftc.gov/idtheft/

** The Identity Theft Insurance is underwritten and administered by American Bankers Insurance Company of Florida, an Assurant company. Please refer to the actual policies for terms, conditions, and exclusions of coverage. Coverage may not be available in all jurisdictions.

Consider Placing a Fraud Alert on Your Credit File. A fraud alert helps protect you against the possibility of an identity thief opening new credit accounts in your name. When a business sees the alert on your credit history of someone applying for credit, the merchant gets a notice that the applicant may be the victim of identity theft. The alert notifies the merchant to take steps to verify the identity of the applicant. You can place a fraud alert on your credit report by calling any one of the toll-free numbers provided below. You will reach an automated telephone system that allows you to flag your file with a fraud alert at all three consumer reporting agencies. For more information on fraud alerts, you also may contact the FTC as described above.

| Equifax | Experian | TransUnion |
|---|---|---|
| Equifax Information Services LLC | Experian Inc. | TransUnion LLC |
| P.O. Box 105069 | P.O. Box 9554 | P.O. Box 2000 |
| Atlanta, GA 30348-5069 | Allen, TX 75013 | Chester, PA 19016 |
| 1-888-836-6351 | 1-888-397-3742 | 1-800-680-7289 |
| www.equifax.com | www.experian.com | www.transunion.com |

**Consider Placing a Security Freeze on Your Credit File.** You may wish to place a "security freeze" (also known as a "credit freeze") on your credit file. A security freeze is designed to prevent potential creditors from accessing your credit file at the consumer reporting agencies without your consent. Unlike a fraud alert, you must place a security freeze on your credit file at each consumer reporting agency individually. There is no charge to place or lift a security freeze. For more information on security freezes, you may contact the three nationwide consumer reporting agencies or the FTC as described above. As the instructions for establishing a security freeze differ from state to state, please contact the three nationwide consumer reporting agencies to find out more information.

The consumer reporting agencies may require proper identification prior to honoring your request. For example, you may be asked to provide:

- Your full name with middle initial and generation (such as Jr., Sr., II, III)
- Your Social Security number
- Your date of birth
- Addresses where you have lived over the past five years
- A legible copy of a government-issued identification card (such as a state driver's license or military ID card)
- Proof of your current residential address (such as a current utility bill or account statement)

**For Iowa Residents.** You may contact law enforcement or the Iowa Attorney General's Office to report suspected incidents of identity theft. This office can be reached at:

Office of the Attorney General of Iowa
Hoover State Office Building
1305 E. Walnut Street
Des Moines, IA 50319
(515) 281-5164
www.iowaattorneygeneral.gov

**For Maryland Residents.** You can obtain information from the Maryland Office of the Attorney General about steps you can take to avoid identity theft. You may contact the Maryland Attorney General at:

Maryland Office of the Attorney General
Consumer Protection Division
200 St. Paul Place
Baltimore, MD 21202
(888) 743-0023 (toll-free in Maryland)
(410) 576-6300
www.marylandattorneygeneral.gov

**For Massachusetts Residents.** You have the right to obtain a police report and request a security freeze as described above. The consumer reporting agencies may require that you provide certain personal information (such as your name, Social Security number, date of birth and address) and proper identification (such as a copy of a government-issued ID card and a bill or statement) prior to honoring your request to place a security freeze on your account.

**For New Mexico Residents.** You have rights under the federal Fair Credit Reporting Act ("FCRA"). These include, among others, the right to know what is in your file; to dispute incomplete or inaccurate information; and to have consumer reporting agencies correct or delete inaccurate, incomplete, or unverifiable information. For more information about the FCRA, please visit https://files.consumerfinance.gov/f/201504_cfpb_summary_your-rights-under-fcra.pdf or www.ftc.gov.

**For New York Residents.** You can obtain information from the New York State Office of the Attorney General about how to protect yourself from identity theft and tips on how to protect your privacy online. You can contact the New York State Office of the Attorney General at:

Office of the Attorney General
The Capitol
Albany, NY 12224-0341
1-800-771-7755 (toll-free)
1-800-788-9898 (TDD/TTY toll-free line)
https://ag.ny.gov/

Bureau of Internet and Technology ("BIT")
28 Liberty Street
New York, NY 10005
(212) 416-8433
https://ag.ny.gov/resources/individuals/consumer-issues/technology

**For North Carolina Residents.** You can obtain information from the North Carolina Attorney General's Office about preventing identity theft. You can contact the North Carolina Attorney General at:

North Carolina Attorney General's Office
9001 Mail Service Center
Raleigh, NC 27699-9001
(877) 566-7226 (toll-free in North Carolina)
(919) 716-6400
www.ncdoj.gov

**For Oregon Residents.** We encourage you to report suspected identity theft to the Oregon Attorney General at:

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(877) 877-9392 (toll-free in Oregon)
(503) 378-4400
www.doj.state.or.us

**For Rhode Island Residents.** You may obtain information about preventing and avoiding identity theft from the Rhode Island Office of the Attorney General at:

Rhode Island Office of the Attorney General
Consumer Protection Unit
150 South Main Street
Providence, RI 02903
(401)274-4400
www.riag.ri.gov

You have the right to obtain a police report and request a security freeze as described above. The consumer reporting agencies may require that you provide certain personal information (such as your name, Social Security number, date of birth, and address) and proper identification (such as a copy of a government-issued ID card and a bill or statement) prior to honoring your request for a security freeze on your account.

**For Washington, D.C. Residents.** You may obtain information about preventing and avoiding identity theft from the Office of the Attorney General for the District of Columbia at:

Office of the Attorney General for the District of Columbia
400 6th Street NW
Washington, D.C. 20001
(202)727-3400
www.oag.dc.gov